CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

02/25/2026

LAURA A. AUSTIN, CLERK
BY: **/s/ Amy Fansler**
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| JAMES B., | ) | |
| Plaintiff, | ) | Civil Action No. 5:25-cv-00007 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| FRANK BISIGNANO, | ) | By:    Joel C. Hoppe |
| Commissioner of Social Security, | ) |           United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff James B. asks this Court to review the Commissioner of Social Security's final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. ECF No. 1. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 7, the parties' briefs, ECF Nos. 16, 18, 19, and the applicable law, I find that the Administrative Law Judge ("ALJ") did not correctly apply 20 C.F.R. § 404.1520c to a consultative examiner's medical opinion that James's impairments prevent him from lifting or carrying more than five pounds and that the ALJ's reasons for rejecting the opinion are not supported by substantial evidence, R. 30–31 (citing R. 849–56). Accordingly, I respectfully recommend that the presiding District Judge reverse the Commissioner's final decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

1

reviewing the merits of the Commissioner's final decision asks only whether the ALJ applied the correct legal standards and whether substantial evidence in the existing record supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). *See Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019). Substantial-evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, a court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## II. Legal Framework

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine if a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe

impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. "At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy,' considering the claimant's residual functional capacity, age, education, and work experience." *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015) (quoting 20 C.F.R. §§ 416.920(a)(4)(v), 416.960(c)(2), 416.1429); *accord* 20 C.F.R. §§ 404.1520, 404.1560, 404.929. "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations" and vocational factors. *Mascio*, 780 F.3d at 635; *see Britt v. Saul*, 860 F. App'x 256, 263 (4th Cir. 2021) (citing *Mascio*, 780 F.3d at 636–37); *Jolly v. Barnhart*, 465 F. Supp. 2d 498, 504–05 (D.S.C. 2006). "If the Commissioner meets [this] burden, the ALJ finds the claimant not disabled and denies the application for benefits." *Mascio*, 780 F.3d at 635.

### III. Procedural History

James filed for DIB in June 2021. *See* R. 61, 165–69. He alleged that he had been disabled since October 1, 2019, because of a bilateral shoulder injury and left total shoulder replacement. *See* R. 168, 238. In March 2022, on initial review, Virginia Disability Determination Services ("DDS") denied James's claim. R. 61. James filed for reconsideration based on a right total shoulder replacement scheduled for late April 2022 and alleged new and

3

worsened symptoms. R. 291. In July 2022, DDS contracted Erik Scott, M.D., to conduct a

consultative examination[1] of James. *See* R. 849–56. A month later, DDS again denied James's

claim on reconsideration. R. 78. On October 19, 2023, James appeared with counsel and testified

at a hearing before ALJ Peter Koclanes. R. 46–57. A vocational expert ("VE") also testified at

the hearing. R. 57–59.

On November 15, 2023, ALJ Koclanes issued an unfavorable decision. R. 21–34. At step

two, he found that James had "severe" medically determinable impairments ("MDIs") of

"bilateral shoulder osteoarthritis, status post left total shoulder arthroplasty and bilateral reverse

total shoulder arthroplasty, bilateral carpal tunnel syndrome, and status post left carpal tunnel

release." R. 24. At step three, he found that James's severe MDIs did not meet or medically

equal the severity of any relevant Listing. R. 25 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§

1.18, 11.14).

Next, ALJ Koclanes evaluated James's residual functional capacity ("RFC") based on the

medical and other evidence in his record. *See* R. 25–32. He found that James could perform

"light" work[2] as defined by regulation "except no crawling or use of ladders/ropes/scaffolds;

frequent bilateral hand controls; never reaching overhead and frequent reaching in other

directions with both hands; no unprotected heights or moving mechanical parts; and he must

---

[1] A consultative examination is "a physical or mental examination or test purchased for [the claimant] at [the agency's] request and expense from a treating source or another medical source." 20 C.F.R. § 404.1519. If the agency "cannot get the information [it] need[s] from [the claimant's] medical sources, [it] may decide to purchase a consultative examination." *Id.* § 404.1519a(a). The agency "may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [it] to make a determination or decision on [the] claim." *Id.* § 404.1519a(b).

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

avoid exposure to vibration." R. 25–26.

At step four, ALJ Koclanes found that James's RFC prevented him from returning to his previous job as a state trooper. R. 32 (citing R. 57). However, based on the VE's testimony, he found at step five that James's RFC, age, education, and work experience allowed him to adjust to certain light unskilled jobs (small parts assembler, electronics assembler, and shipping and receiving weigher) that existed in a significant number in the national economy. R. 33 (citing R. 58). Accordingly, ALJ Koclanes concluded that James was not disabled from October 1, 2019, through November 15, 2023. R. 33–34. The Appeals Council denied James's request for review, R. 8–10, making ALJ Koclanes's decision the final decision of the Commissioner. This appeal followed.

## IV. Discussion

On appeal, James's primary and prevailing argument is that ALJ Koclanes did not "properly evaluate the supportability and consistency of the medical opinion of the consultative examiner, Erik Scott, M.D., pursuant to 20 C.F.R. § 404.1520c." Pl.'s Br. 4. In a written report, Dr. Scott expressed the opinion that James could "lift and carry 5 pounds *only* due to bilateral shoulder replacements, shoulder pain." *Id.* at 3 (emphasis added) (quoting R. 855). ALJ Koclanes rejected this opinion, concluding that it was "not supported by [Dr. Scott's] exam or consistent with the other records of evidence." R. 31. James argues that the ALJ did not adequately explain how he considered the opinion's supportability, *see* Pl.'s Br. 5–8, or consistency, *see id.* at 8–11. He argues that the reasons the ALJ provided for rejecting the opinion are "conclusory" and "not supported by substantial evidence," *id.* at 5, 7; they improperly "cherrypick" the record, *id.* at 6 (quoting *Lewis*, 858 F.3d at 869); *see id.* at 10 (citing *Hines*, 453 F.3d at 566); and they lack sufficient explanation to "build an accurate and logical bridge from the evidence to [the ALJ's]

conclusion" to permit meaningful review, *id.* at 6 (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)); *see id.* at 11 (citing *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019)).

James points out that, if credited, Dr. Scott's opinion "would indicate that [James] can perform less than the sedentary level of lifting [and carrying]." *Id.* at 11. This, in turn, would direct a finding of disability based on the Vocational-Medical Guidelines and the VE's testimony in this case. *See id.*; *see also* R. 32–33 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 202.14, 202.21); R. 33 (citing R. 57–58). Accordingly, James argues "the decision should be remanded and reversed for further proceedings." Pl.'s Br. 12; *see* Pl.'s Reply Br. 4 ("Because the ALJ's rationale with regard to Dr. Scott's opinion leaves large gaps in reasoning, remand for further proceedings is appropriate."). The Court agrees.

## A.    *Legal Standard*

Because ALJ Koclanes did not find James conclusively disabled at step three, he had to assess James's RFC to determine whether he could return to his past work or adjust to other work. *See* 20 C.F.R. § 404.1545(a)(1). A claimant's RFC is "the most [he] can still do" despite the limitations caused by his impairments and related symptoms. *Id.* It is a factual finding by the ALJ as to the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). When assessing the claimant's RFC, the ALJ must first "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." *Id.* at *1 (citing 20 C.F.R. § 404.1545(b)–(d)). Only after the functional analysis is complete "may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." *Id.*

The ALJ must consider "all the relevant evidence in the record" when identifying the claimant's functional limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(3); *see* SSR 96-8p, 1996 WL 374184, at *5. Additionally, the ALJ must include in his written RFC analysis "a narrative discussion describing how the evidence supports each conclusion" and an explanation of "how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p, 1996 WL 374184, at *7. In other words, the ALJ must "build a logical bridge from the evidence to his conclusion[s]" in the RFC analysis. *Monroe*, 826 F.3d at 189 (citation omitted); *see also Thomas*, 916 F.3d at 311 ("[A] proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion. . . . [M]eaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion.").

Medical opinions often inform the RFC analysis. *See, e.g.*, *Drumgold v. Comm'r of Soc. Sec.*, 144 F.4th 695, 600–01 (4th Cir. 2025); *Oakes v. Kijakazi*, 70 F.4th 207, 212–13 (4th Cir. 2023). "A medical opinion is a statement from a medical source about what [the claimant] can still do despite [his] impairment(s) and whether [he has] one or more impairment-related limitations or restrictions" that prevent him from meeting specific functional demands of work. 20 C.F.R. § 404.1513(a)(2). For claims filed after March 27, 2017, like James's, 20 C.F.R. § 404.1520c governs an ALJ's evaluation of medical opinions. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819 (Jan. 18, 2017), *corrected by* 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017). Under that regulation, the ALJ must evaluate the persuasiveness of all medical opinions in the record using five factors: (1) supportability, (2) consistency, (3) the medical source's relationship with the claimant, (4) the medical source's specialization, and (5) other relevant factors, like the medical source's familiarity with other evidence in the record or understanding of Social Security Administration

7

disability program policies and requirements. 20 C.F.R. § 404.1520c(c). Supportability and

consistency are "the most important" of these factors. *Id.* § 404.1520c(b)(2). Accordingly, the

ALJ must articulate in his written decision "how persuasive" he found each medical source's

opinions and "explain how [he] considered the supportability and consistency factors." *Id.* §

404.1520c(b), (b)(2). Supportability is the degree to which a medical source supports his or her

medical opinion with "relevant . . . objective medical evidence and supporting explanations." *Id.*

§ 404.1520c(c)(1); *see Oakes*, 70 F.4th at 212. Consistency is the degree to which a medical

opinion is consistent "with the evidence from other medical sources and nonmedical sources" in

the record. 20 C.F.R. § 404.1520c(c)(2); *see Oakes*, 70 F.4th at 212. The ALJ must adequately

explain in his written decision how he considered *both* supportability and consistency. *See*

*Drumgold*, 144 F.4th at 605–06. In contrast, the ALJ need not explain how he considered the

other persuasiveness factors unless he found conflicting medical opinions about the same issues

to be equally well-supported and equally consistent with the record. *See* 20 C.F.R. §

404.1520c(b)(2)–(3); *Drumgold*, 144 F.4th at 605.

"Like the ultimate determination that a claimant has or lacks residual functional capacity,

[the Court] review[s] the subsidiary determination that a medical opinion has or lacks

supportability or consistency for substantial evidence." *Drumgold*, 144 F.4th at 606. Under the

substantial-evidence standard, the duty to resolve conflicting medical opinions "lies with the

ALJ." *Id.* at 605 (quoting *Richardson*, 402 U.S. at 399). If the ALJ evaluates conflicting medical

opinions "by applying the correct factors," the Court will not disturb "the decision unless it is

exceptionally clear the ALJ made a mistake." *Id.* The ALJ must nevertheless adequately explain

how he considered the supportability and consistency factors to allow for meaningful review. *See*

82 FR 5844-01, 2017 WL 168819, at *5858 (explaining that the "articulation requirements" in

8

20 C.F.R. § 404.1520c should allow a "reviewing court to trace the path of an [ALJ's] reasoning"). When the Court is "'left to guess' as to how the ALJ reached [his] evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of [his] conclusions," *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018) (quoting *Mascio*, 780 F.3d at 638), to ensure "the ALJ's decision is supported as a matter of fact and law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). *See, e.g.*, *Stephen R. v. O'Malley*, No. 21-2292, 2024 WL 3508155, at *4 (4th Cir. July 23, 2024) (citing *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017)). Thus, when evaluating the persuasiveness of a medical opinion, ALJs "must not only reach a conclusion supported by substantial evidence but also build an accurate and logical bridge from the evidence to their conclusions." *Drumgold*, 144 F.4th at 605 (cleaned up).

B.    *Summary*

1.    *Medical Records*

On January 2, 2018, while working as a Virginia State Trooper, James sustained a bilateral shoulder injury during an operation to recover an underwater vehicle. *See* R. 199, 243–44, 710, 758. James was in "good physical health" before the shoulder injury—he did "regular weightlifting and ran about 800 miles a year." R. 361. After the injury, he experienced "increasing left shoulder discomfort" and "stopped lifting weights and decreased his running time." *Id.* By October 2019, James had been diagnosed with left shoulder osteoarthritis and was receiving treatment from Brian Dean, M.D., at Shenandoah Valley Orthopedics. *See* R. 361, 363.

On October 11, 2019, James underwent a left total shoulder replacement. *See* R. 410–412. In the surgical report, Dr. Dean noted that James presented with a "longstanding history of severe and intractable left shoulder pain" and that clinical tests and radiographic imaging were

9

"consistent with significant degenerative osteoarthritis of the glenohumeral joint." R. 410. James

tolerated the procedure well and was discharged the next day with oxycodone from the hospital

pharmacy and a two-week prescription for aspirin. R. 412–13. He began post-operative physical

therapy at Highland Medical Center on October 22. R. 418.

At a follow-up visit with Dr. Dean on November 20, 2019, James was no longer taking

narcotic pain medication and was not using an immobilization device, but he was experiencing

"some pain" during physical therapy. *See* R. 414. He complained of numbness and decreased

motion. R. 414–15. Examination of the left shoulder showed active abduction and active forward

flexion both to 90 degrees. R. 415. Dr. Dean deferred strength testing for a future visit. *Id.* He

instructed James to continue physical therapy and prescribed ibuprofen twice daily. R. 415, 417.

On December 3, 2019, James saw Rhonda Lambert, M.P.T., at Highland Medical Center

for a physical therapy progress evaluation. *See* R. 418–19. He complained of pain in his upper

left trapezius, numbness in his left wrist, and difficulty reaching above and away from his body

with his left arm. R. 418. He said his pain was 3/10 at worst and that he felt "achy." *Id.* James's

FOTO score[3] reflected improvement in functional limitation from 59% to 42% since starting

physical therapy, and his OPTIMAL score for difficulty carrying, moving, and handling objects[4]

reflected improvement in functional limitation from 50% to 19% during the same period. *Id.*

---

[3] The Focus on Therapeutic Outcomes ("FOTO") score measures functional performance specific to a body part or a particular orthopedic medical condition through patient self-reporting, with scores adjusted to account for patient characteristic such as age, gender, severity and complexity of medical conditions, and post-surgical status and type of surgery. *FOTO Measures*, Net Health (July 30, 2025), https://www.nethealth.com/public-access-to-foto-measures/ [https://perma.cc/5D37-JW88].

[4] The Outpatient Physical Therapy Improvement in Movement Assessment Log ("OPTIMAL") score uses self-reporting to measure a patient's difficulty performing certain movements involved in functional activities. *Outpatient Physical Therapy Improvement in Movement Assessment*, Shirley Ryan Activity Lab (Apr. 10, 2013), https://www.sralab.org/rehabilitation-measures/outpatient-physical-therapy-improvement-movement-assessment-log [https://perma.cc/N2HV-STRG]. The provider can calculate a specific "item score" to measure progress across three movements the patient is most interested in improving. *Id.*

Examination of the left shoulder showed active flexion to 90 degrees, active abduction to 80 degrees, external rotation strength at 4-/5, and internal rotation strength at 4/5. *Id.* Ms. Lambert noted that James was "[i]ndependent in dressing, driving" but "unable to reach overhead or tilt away from [his] side with [his] left [upper extremity]." *Id.* She observed that James had good rehabilitation potential and was "motivated" but would need "slow," "gradual," and "significant strengthening to be able to return to full duty as a State Trooper." R. 419. He had met his short-term goals of starting independent range of motion exercise at home and keeping pain at 3/10 or lower "with all activities [with the] left shoulder." *Id.* However, he was still "[p]rogressing" with his long-term goals of achieving active flexion and active abduction to 140 degrees and 5/5 strength in the left shoulder, doing independent strengthening exercise at home, carrying 50 pounds for 10 feet with "proper form," and swimming without left shoulder pain. *Id.* Ms. Lambert noted that James would "[c]ontinue" toward these goals and that strengthening would be "gradual" and "as able." *Id.*

On January 3, 2020, James told Ms. Lambert he had to "use [his] right arm to help get [his] left [arm] up." R. 423. He had been exercising at home. *Id.* James said his pain was between 2/10 and 3/10 at worst and that he took ibuprofen "one in a while." *Id.* His FOTO score reflected regression in functional limitation from 42% to 47% since his last evaluation. *Id.* Likewise, his OPTIMAL score for difficulty carrying, moving, and handling objects reflected regression in functional limitation from 19% to 21% over the same period. *Id.* Examination of the left shoulder showed active flexion to 130 degrees and active abduction to 120 degrees, but James "struggled" to get to 130 degrees flexion and found it "painful" to get to 120 degrees abduction. *Id.*

On January 7, 2020, James told Dr. Dean he was experiencing "some pain" and decreased motion, but he felt his left shoulder was "continuing to demonstrate steady

11

improvement." R. 420. Examination of the left shoulder showed 4/5 strength across all metrics, active flexion to 110 degrees, and active abduction to 140 degrees. R. 421. At his next visit on February 4, 2020, James again told Dr. Dean that he felt his shoulder was "continuing to demonstrate steady improvement." R. 428. Examination of the left shoulder showed increased internal rotation strength at 5/5 and increased active abduction to 160 degrees. *Compare* R. 429, *with* R. 421. Dr. Dean noted that James "certainly had not achieved [maximum medical improvement]," but he accepted James's self-assessment that he could "safely perform his job at this point with minimal strength and motion deficits." R. 430. He authorized James to return to work and instructed him to continue physical therapy and as he worked on fully transitioning to home exercise. R. 429; *see* R. 427.

However, on May 13, 2020, James told Dr. Dean he had been "taken off active duty at work by a State Police physician" because he could not "hold up the forearm of a shotgun." R. 433. While James reported "very little pain" and was "pleased with his outcome from a pain standpoint," he "continued to note ongoing weakness." *Id.* Additionally, James had "not been pushing to increase his reps and/or resistance" during home exercise because he was "concerned that mild pain" he experienced during exercise might "be a sign that he [was] damaging something." *Id.* Examination of the left shoulder showed increased active flexion to 160 degrees but no change in strength or active abduction. *Compare* R. 434, *with* R. 429. Dr. Dean observed that, "[d]ue to weakness," James was "unable to maintain full flexion of the shoulder beyond 90 [degrees] for more than 10 seconds." R. 434. Dr. Dean thought it "prudent to keep [James] off work" and "defer[ed] to the opinion of the State physician." R. 435. However, he was optimistic James would "continue to see steady gains in terms of strength and function in his shoulder." *Id.* He instructed James to "be more aggressive in terms of increasing strength" despite the "mild

pain" during exercise, and to continue physical therapy as he worked on fully transitioning to home exercise. *Id.* On May 29, James called Shenandoah Valley Orthopedics and told a nurse case manager that Dr. Dean had not renewed his physical therapy prescription during the office visit. R. 437. James mentioned he had not gone to physical therapy since February 2020 and that he felt "formal [physical therapy] would benefit him." *Id.* Dr. Dean renewed James's physical therapy prescription later the same day. *See* R. 436.

At his next office visit on July 14, 2020, James "continue[d] to note ongoing weakness" and told Dr. Dean that he had been laid off from work by the State Police. R. 441. Examination of the left shoulder showed no change in strength or range of motion. *Compare* R. 442, *with* R. 434. Again, "[d]ue to weakness," James was "unable to maintain full flexion of the shoulder beyond 90 [degrees] for more than 10 seconds." R. 442. Dr. Dean instructed James to continue physical therapy as he worked on fully transitioning to home exercise. R. 443. Dr. Dean remained optimistic that James would "continue to see steady gains in terms of strength and function in the shoulder," but he noted that a computerized tomography ("CT") arthrogram might be needed "to evaluate for rotator cuff tear" if James "fails to demonstrate slow steady gains." *Id.*

On July 22, 2020, James saw Clint Kalbach, D.P.T., at Highland Medical Center for a physical therapy intake evaluation. *See* R. 444–46. He told Mr. Kalbach he had been doing home exercise and "started swimming and kayaking," but he felt that he had not "improved" since he stopped going to physical therapy sessions in February that year. R. 445 (noting "outpatient PT at HMC 10/22/2019 through 2/13/2020"). He explained: "Close to my body, I'm OK, but my left arm is really weak with anything requiring lifting my arm away from my body." *Id.* James complained of anterior left shoulder pain, upper left trapezius pain, and weakness and decreased motion in the left shoulder. *Id.* James said his upper left trapezius pain was 2.5/10 on average and

4/10 at worst, and his anterior left shoulder pain was 6/10 on average and 7/10 at worst. *Id.* He told Mr. Kalbach that he could not retrieve a bowl of soup from his microwave that was "just above shoulder height" or lift more than two pounds overhead. *Id.* In his notes, Mr. Kalbach listed "[h]obbies/activities softball, kayaking, swimming, hunting, fishing," but he did not indicate whether James was engaged in those activities at the time of the evaluation. *Id.* James's OPTIMAL score for difficulty carrying, moving, and handling objects reflected 38% functional limitation. R. 446. Examination of the left shoulder showed active flexion to 89 degrees, active abduction to 85 degrees, 3-/5 flexion strength, 3+/5 external rotation strength, and 4-/5 internal rotation strength. *Id.* Mr. Kalbach observed that James "present[ed] with . . . poor sitting posture; significant [left] shoulder weakness, limited left shoulder [range of motion], poor scapular mechanics with shoulder elevation (significant hiking and retraction), and significant functional limitation." R. 447. He felt that rehabilitation potential was "good" and set long-term goals for James of retrieving a dinner plate from an overhead shelf or microwave "just above shoulder height," using the left hand "with minimal difficulty," and holding and aiming a shotgun "with minimal difficulty." *Id.*

At his next evaluation with Mr. Kalbach on August 24, 2020, James complained that he was "still really weak in [his] shoulder," had to "throw [his left shoulder] up" to reach upward, and that his left upper trapezius was "always sore from hiking [his] shoulder all the time," with "[a]ny quick motion . . . hurt[ing] a lot." R. 450. However, he felt that his anterior left shoulder pain and upper trapezius pain were improving and estimated pain in both areas at 1/10 on average and 3/10 at worst. R. 450–51. Examination of the left shoulder showed "improving" active abduction to 85 degrees but "no change" in strength or active flexion. R. 451–52. Mr. Kalbach noted "no significant change" in left shoulder strength or James's ability to retrieve a

14

dinner plate from a microwave "just above shoulder height" or lift more than two pounds overhead, but he stated that James would "continue [these] goals." R. 450, 452.

On September 15, 2020, James saw Dr. Dean and "continue[d] to note ongoing weakness." R. 455. He explained that he had "very little pain," but that he had not noticed "any demonstrable improvement in his [left] shoulder strength" despite attending physical therapy sessions. *Id.* Examination of the left shoulder showed active abduction and active flexion to 160 degrees. R. 456. Supraspinatus, forward elevation, and external rotation were at 4/5 strength, while internal rotation was at 5/5 strength. *Id.* Dr. Dean was "concerned [James] may have a tear of his rotator cuff" and noted that he would schedule a CT arthrogram. R. 456–57. He instructed James to stay "off work until the next followup visit due to shoulder weakness" and to continue physical therapy. *Id.*

On September 23, 2020, James saw Mr. Kalbach for a physical therapy progress evaluation. *See* R. 459–60. He reported that his shoulder was not "bothering him at night anymore," but that it "[got] weak easily" and he "[didn't] have strength when [his] arm [was] away from [his] body." R. 459. Mr. Kalbach noted "slightly" improved left shoulder strength, but "no significant change" in James's ability to retrieve a dish from a microwave "just over shoulder height" or lift more than two pounds overhead. R. 459–60. James's OPTIMAL score for difficulty carrying, moving, and handling objects reflected improvement in functional limitation from 38% to 13% since restarting physical therapy in July. R. 460. Examination of the left shoulder showed improved active flexion to 93 degrees, improved active abduction to 95 degrees, no change in flexion strength, improved external rotation strength of 4-/5, and improved internal rotation strength of 4/5. R. 460–61. Mr. Kalbach maintained that James had "good" rehabilitation potential, observing that he had met his goal of being able to do independent home

15

exercise but still had "significant functional limitations." R. 461.

On October 21, 2020, Jonathan Craun, D.O., took a CT arthrogram of James's left shoulder. *See* R. 463. Dr. Craun observed that the hardware from James's left total shoulder replacement appeared to be intact and that there was no "dislocation," "acute fracture," or "evidence of significant rotator cuff tendon tear." R. 463–64. However, he noted "mild degenerative change of the acromioclavicular joint" and found that the humeral head was "mildly high riding with the humeral component articulating with the proximal half of the glenoid component." R. 464.

On October 26, 2020, James told Mr. Kalbach he did not feel physical therapy was "helping very much." R. 465. He reported doing "2 reps of push-ups the other day" and complained that he was "still hav[ing] trouble moving [his] arms or lifting anything away from [his] body." *Id.* Mr. Kalbach noted "slightly improved" left shoulder strength and "no significant change" in left shoulder range of motion. *Id.* James's OPTIMAL score for difficulty carrying, moving, and handling objects reflected regression in functional limitation from 13% to 46% since he saw Mr. Kalbach in September. *Compare* R. 466, *with* R. 460. Mr. Kalbach observed that James was progressing toward his goals but "[s]lower than expected," with "slightly improved [left] shoulder [active range of motion] but minimal change in overall function." R. 467.

On November 13, 2020, James told Dr. Dean that his symptoms had remained "constant" since his last visit and complained of "moderate and intermittent" pain that felt "sharp" but "[did] not radiate." R. 477. He explained that the pain was "aggravated by lifting the arm above the head and lifting [weight]." *Id.* James also complained of decreased shoulder motion, weakness in both arms, and stiffness, noting persistent weakness and localized pain around both

16

biceps. *Id.* Dr. Dean observed that James "ha[d] not found relief from any prior treatments" and that his "symptoms interfere[d] with [activities of daily living]." *Id.* Examination of the right arm showed full range of motion and 5/5 strength. R. 478. Examination of the left shoulder showed reduced active abduction to 100 degrees and no change in active flexion or strength since James's last visit with Dr. Dean in September. *Compare* R. 478, *with* R. 456. Dr. Dean referred James to University of Virginia Health System ("UVA") for a second opinion. R. 479.

On December 13, 2020, James saw Brian Werner, M.D., at UVA for an intake visit. *See* R. 780–82. James reported no pain when resting and no numbness, but he told Dr. Werner that left shoulder pain interrupted his sleep and that his left shoulder was "catching and grinding." R. 780. Examination of the right shoulder showed full range of motion and 5/5 strength. R. 781–82. Examination of the left shoulder showed forward flexion and abduction to 100 degrees and 3/5 external rotation and supraspinatus strength. *Id.* Based on James's medical history and the examination, Dr. Werner determined that James was a candidate for a left revision total shoulder replacement. R. 782. He mentioned the possibility of "incomplete pain relief" and "failure requiring revision surgery." *Id.* James elected to move forward with the procedure because "he [had] failed extensive conservative treatments." *Id.*

On February 4, 2021, James was admitted to UVA Hospital East for the left revision total shoulder replacement. R. 796. The surgeon, Scott Dart, M.D., noted that James presented "with recalcitrant pain and dysfunction secondary to a failed [total shoulder replacement]," including "activity derived symptoms with deterioration in function and limitations in quality of life." R. 796. James was in stable condition after the procedure. R. 798. Post-operative imaging showed no "immediate complication." R. 792. James was discharged the same day with prescriptions for acetaminophen, oxycodone, ketorolac, and aspirin. R. 787–88.

At follow-up visits with Dr. Werner on February 17, March 19, and April 28, 2021, James had no significant complaints. *See* R. 799–800, 804–05, 807–08. He told Dr. Werner that he was experiencing "minimal pain," R. 799, 804, and he was routinely going to physical therapy sessions, R. 799, 804, 807. James was only taking acetaminophen as needed. R. 799, 804, 807. Imaging and physical examinations showed no complications at the site of the surgery. R. 799, 801, 804, 807, 809. James was steadily recovering range of motion and strength in his left shoulder. *See* R. 799–800, 804–05, 807–08. By his April visit with Dr. Werner, examination of the left shoulder showed forward flexion to 180 degrees, abduction to 160 degrees, and 4/5 external and internal rotation strength. R. 807–08. Dr. Werner noted that he expected James to achieve maximum medical improvement by his next follow-up visit in three months. R. 808.

James saw Mr. Kalbach for physical therapy from February through mid-May 2021. *See* R. 623–80. At an initial post-operative evaluation on February 8, 2021, James told Mr. Kalbach that the left revision total shoulder replacement "went 1000 times better than [his] previous total shoulder replacement." R. 678. He said he "hardly [had] any pain or bruising" and was able to manage the pain with acetaminophen, ice, a sling, and an abduction pillow. *Id.* At a progress evaluation on April 13, 2021, Mr. Kalbach noted that James could pick up a drinking glass, put on clothing, cut food, wash dishes, and drive with "no difficulty" or "minimal difficulty." R. 640. However, James complained that he "still [had] a lot of trouble reaching behind [his] back" and was "still weak and [had] pain in front of [his] shoulder." R. 639–40. Examination of the left shoulder showed 4-/5 flexion strength, 4/5 internal rotation strength, 4-/5 external rotation strength, 4/5 bicep strength, standing flexion to 138 degrees, and standing abduction to 120 degrees. R. 641. James's OPTIMAL score for difficulty carrying, moving, and lifting objects reflected a 67% functional limitation. *Id.*

18

On May 14, 2021, James saw Mr. Kalbach for a final evaluation before discontinuing physical therapy and transitioning to home exercise. *See* R. 623–26. James told Mr. Kalbach he thought his "shoulder [was] progressing well" and that his "[r]ange of motion [was] really good." R. 623. However, he complained that he "still [had] an issue with strength when [he was] reaching/lifting at arm's length, especially out to the side," and that his "left arm also tire[d] out really easily." *Id.* His OPTIMAL score for difficult carrying, moving, and handling objects reflected improvement in functional limitation from 67% to 38% since April. R. 625. Examination of his left shoulder showed decreased active standing abduction to 107 degrees and "no significant change" in standing flexion. *Id.* Strength was "not re-assessed." *Id.* Mr. Kalbach observed that James had met his goals of doing "advanced" home exercise and retrieving a five-pound weigh from an overhead shelf with his left arm "with minimal difficulty," but had not met his goal of achieving active flexion in the left shoulder to 130 degrees. R. 626.

During his routine physical therapy sessions following the left revision total shoulder replacement, James reported varying levels of pain and difficulty when completing daily activities and home exercise. *See, e.g.*, R. 666 (March 1, 2021: "I walked briskly on the treadmill (4 mph) for 40 minutes; I'm a little sore in my shoulder."); R. 650 (March 26, 2021: "I did a lot of work on my truck (removed rust from frame, painted frame, installed nerf bars); the truck was on a lift, so I didn't have to reach overhead; it wasn't bad."); R. 648 (March 30, 2021: "I've been doing a lot of wood working lately. My shoulder doesn't feel bad."); R. 646 (April 2, 2021: "I've been working on my truck today, removing the rear bumper. I was using an impact driver to remove the bolts. Several bolts were rusted and broke off. My neck hurts from that."); R. 631 (May 5, 2021: "I've been doing some strength training at home. That is going well."); R. 629 (May 7, 2021: "I waxed my car yesterday. I mostly used my right hand, but I leaned on the

19

vehicle with my left hand. I'm sore in my left shoulder and neck today.").

On May 10, 2021, Dr. Werner submitted an "Attending Physician's Statement Long Term Disability," in which he ranked James's level of physical impairment as "Class 3 – Moderate limitation of functional capacity; capable of clerical administrative (sedentary) activity. (35-55%)." R. 519–20. On an attached note, Dr. Werner wrote that James would "be able to return to work with the following restrictions for the next three months: no lifting greater than 25lbs" and that a new functional evaluation would be completed after the three-month period. R. 521.

James saw Dr. Werner on August 25, 2021, and reported some limitations in range of motion. R. 817. However, he said he had "no pain." *Id.* Examination of the left shoulder showed forward flexion to 180 degrees and abduction to 150 degrees. R. 818. Dr. Werner concluded that James was "doing very well for revision [total shoulder replacement], with some expected functional limitations." *Id.* He provided a note stating that James should stay off work and instructed James to continue with physical therapy. *Id.*

On December 22, 2021, James told Dr. Werner had he been experiencing "gradually worsening right shoulder pain" and that he felt his right shoulder was "crunchy" when he moved it. R. 822. James felt he had "pain with any motion," though he "still ha[d] strength about his [right] shoulder." *Id.* Examination of the right shoulder showed forward flexion to 120 degrees, abduction to 90 degrees, and 5/5 strength across all metrics. R. 823. Examination of the left shoulder showed forward flexion to 180 degrees, abduction to 160 degrees, and 5/5 strength across all metrics. *Id.* The same day, Weston Winkler, D.O., took x-rays of the right shoulder that showed "[n]o displaced fracture or dislocation." R. 825. However, the imaging showed "[s]evere degenerative changes of the glenohumeral joint including joint space loss, subchondral

20

sclerosis, and inferiorly oriented osteophytes," as well as "[m]ild degenerative arthrosis of the acromioclavicular joint." *Id.* Dr. Winkler assessed "[s]evere glenohumeral and mild acromioclavicular joint osteoarthritis" of the right shoulder. *Id.* Dr. Werner reviewed the imaging and told James he was a candidate for right reverse total shoulder replacement. R. 824. Dr. Werner mentioned "the possibility of incomplete pain relief, or failure requiring revision surgery." *Id.* James told Dr. Werner he "would prefer to proceed with surgery given that he had failed extensive conservative treatments." *Id.*

Pre-operative imaging on April 1, 2022, confirmed "[m]ild to moderate degenerative changes of the [acromioclavicular] joint" and "[s]evere degenerative changes of the right glenohumeral joint." R. 828–29. On April 25, 2022, James underwent the right reverse total shoulder replacement at the UVA Outpatient Surgery Center. *See* R. 831. Dr. Werner, who performed the procedure, recorded a diagnosis of "[r]ight shoulder end stage osteoarthritis with retroverted glenoid." R. 838. Dr. Werner noted that James presented with "recalcitrant pain and dysfunction secondary to end stage osteoarthritis with intact cuff, but with significant reversion of his glenoid." *Id.* He further noted "activity derived symptoms with deterioration in function and limitations in quality of life." *Id.* After the procedure, James was in stable condition. *See* R. 839. Post-operative imaging showed no "evidence of acute complication." R. 833. James was discharged with prescriptions for acetaminophen, oxycodone, ketorolac, and aspirin. R. 830.

At a post-operative physical therapy evaluation on April 28, 2022, James told Mr. Kalbach he was wearing a right shoulder sling "at all times," he was using a cryotherapy machine "several times a day," and his right shoulder felt "stiff and weak." R. 609. Mr. Kalbach noted that before the reverse right total shoulder replacement, James's shoulder had "been getting progressively worse," forcing him to "discontinue strength training . . . due to [right]

21

shoulder pain." *Id.* At the evaluation, James reported sleep disturbances, difficulty putting on pants or a shirt, inability to cut food with a fork and knife, and inability to drive his car due to pain and limited range of motion in his right shoulder. R. 610. James's FOTO score reflected 100% functional limitation in the right shoulder.[5] *Id.* Examination involved no active range of motion testing and no strength testing except handgrip. *See id.* Mr. Kalbach observed that James presented with "poor sitting posture," "limited" passive range of motion, "weakness" in the right shoulder, and "significant functional limitations." *Id.* Mr. Kalbach set long term goals of independent "advanced" home exercise, retrieving a five-pound dumbbell "from an overhead shelf" with his right arm, achieving active flexion to 130 degrees in the right shoulder, being able to drive a car for one hour "without difficulty," and eliminating sleep disturbances due to pain. R. 611.

James continued to see Mr. Kalbach for regular physical therapy sessions through June 2, 2022. *See* R. 593, 595, 599, 603, 605, 607. He did some weightlifting exercises with his wrists, starting with three-pound weights and working up to eight-pound weights. *Compare* R. 607 (May 2, 2022: "R wrist Ext: 3# . . . R wrist Flx: 3#"), *with* R. 593 (June 2, 2022: "R wrist Flx: 8# . . . R wrist Ext, UE on plinth, 4-inch bolster under wrist: 6# . . . seated R wrist pronation/supination with hammer and 1# ankle weight on end"). Mr. Kalbach's records include only one instance of weightlifting not involving the wrists: right bicep curls using a ten-pound weight during the final session on June 2, 2022. *See* R. 593 ("R preacher curl on incline plinth: 10#"). James had varying success completing range of motion exercises during the sessions.

---

[5] The record includes a FOTO survey that James filled out for the April 28, 2022, evaluation. *See* R. 716–17. On the survey, James was asked about "difficulty" completing certain activities with the "affected arm." R. 716. He circled "I Can't Do This" for all activities, which included daily tasks such as "[c]omb or brush your hair," "place a can of soup (1 lb) on a shelf at shoulder height," "reach across the middle of a table . . . to get a salt shaker," and "[p]ull a chair out from a table." *Id.*

22

*Compare* R. 605 (May 6, 2022: "R shoulder isometrics (Flx, Ext, ABd) with flexed elbow: 5-second holds 45 seconds each"), *with* R. 593 (June 2, 2022: "R shoulder Flx and scaption AAROM with pulleys: 3-second holds, NOT TODAY . . . instructed patient to do this at home"). James often complained to Mr. Kalbach of pain while sleeping or doing daily activities. *See, e.g.*, R. 597 (May 24, 2022: "I slept on my shoulder last night. I am hurting today."); R. 595 (May 26, 2022: "I am a little sore. I used my pressure washer today."); R. 593 (June 2, 2022: "I am aching all over. I have been cleaning and landscaping. My right trap is tense because I am hiking my shoulder all the time.").

At a follow-up appointment with Dr. Werner on May 6, 2022, James was still taking acetaminophen, oxycodone, ketorolac, and aspirin for pain. R. 841. Dr. Werner observed no signs of infection or other complication at the surgical incision on James's right arm. R. 842. He deferred range of motion and strength testing, "reinforced" instructions about using a sling, and prescribed continued physical therapy. *Id.* At the visit, Patricia Ojeda, M.D., performed an x-ray of the right shoulder and found that the hardware appeared "intact without evidence of loosening" and that there was no "acute osseous fractures." R. 843. She noted "[m]oderate degenerative change of the acromioclavicular joint." *Id.* Dr. Ojeda recorded an "impression" of "[s]tatus post right reverse total shoulder arthroplasty without hardware complication." *Id.*

On June 17, 2022, James returned to UVA and saw Gary Pugh, PA-C. *See* R. 847. Mr. Pugh observed that James was "[p]rogressing nicely" with physical therapy, that he had been "compliant" in wearing a sling, and that his "pain [was] under control." R. 848. Examination of the right shoulder showed active flexion to 120 degrees. *Id.* No strength testing was performed. *See* R. 847–48. Mr. Pugh discontinued James's prescriptions for oxycodone and ketorolac but kept him on acetaminophen. R. 848. He told James he could discontinue use of a sling "as

23

tolerated," but he instructed James to continue physical therapy. *Id.* Additionally, a "[w]ork note [was] given for left-handed work only." *Id.*

At a February 17, 2023, visit, James told Dr. Werner he "want[ed] to review the results" of a functional capacity evaluation he had recently completed. R. 857. Dr. Werner recorded a pain assessment of 2/10. *Id.* An examination of the right shoulder showed well healed surgical scars, forward flexion to 180 degrees, and abduction to 180 degrees. *Id.* The examination did not include strength testing. *See* R. 857–58. Dr. Werner instructed James to "progress with all activities as symptoms tolerate." R. 858. He noted: "[functional capacity evaluation] reviewed, signed, and work note provided." *Id.* However, the referenced functional capacity assessment and work note are not included in the record.

### 2.    Dr. Scott's Consultative Exam & Medical Opinion

DDS contracted Dr. Scott to conduct a consultative physical examination of James on July 22, 2022. *See* R. 849, 856. Dr. Scott recorded his findings and medical conclusions in a written report. *See* R. 850–55. He began the report by noting that James seemed to be a "reliable historian" and summarizing the history of James's "shoulder problems":

> The claimant reports a history of shoulder problems since 2018 secondary to a dive operation. He reports loss of cartilage, chronic pain, limited range of motion, stiffness and weakness. These symptoms are exacerbated by lifting. The pain intensity is reported to be 3-7/10 on most days and 3/10 on examination today. He has had bilateral shoulder replacements. The claimant states that this affects his ability to work secondary to increased symptoms with prolonged activities.

R. 850. He also included a dated list of James's shoulder surgeries:

> 2022 – Right total shoulder reverse replacement
> 2020 – Left total shoulder reverse replacement
> 2019 – Left total shoulder replacement.

R. 851. Next, Dr. Scott summarized his physical examination findings, *see* R. 852–54, including "[m]uscle strength" on a scale "[o]ut of five," R. 853. Dr. Scott found that James had 4/5

24

strength in the left deltoid, 3/5 strength in the right deltoid, and 4/5 strength in both biceps. *Id.* In

all other areas, he found 5/5 strength. *See id.* In a section on "[m]usculoskeletal" findings, Dr.

Scott noted that James had "some shoulder tenderness on both the right and the left" and that he

"was able to lift, carry and handle light objects." *Id.* Dr. Scott found that James was "cooperative

and gave good effort during the examination." R. 854.

Finally, Dr. Scott concluded his report by summarizing his findings and offering his

medical opinions:

> The claimant's main complaints are bilateral shoulder injuries which he suffered
> during a dive with the state police. He has been a state police member for quite
> some time. During the dive, he injured both shoulders, and has had bilateral total
> shoulder replacements . . . .
>
> For the claimant, his shoulder injury and shoulder weakness are the primary
> concern. He was able to have full range of motion; however, had to use accessory
> motions and accessory muscles to achieve full range of motion of both shoulders.
> His deltoid strength is quite weak with his right weaker than his left. His biceps
> strength is a bit diminished and that is noted in the physical examination on bilateral
> upper extremities.
>
> On physical examination of both shoulder joints, he did have some shoulder
> tenderness on both the right and the left . . . .
>
> The claimant has no limitations with sitting, standing or walking. . . . *The claimant
> can be expected to lift and carry 5 pounds only due to bilateral shoulder
> replacements, shoulder pain.* There are no limitations on bending, stooping,
> crouching and squatting. There are limitations with reaching and the claimant will
> be able to perform this frequently due to shoulder replacements. There are no
> limitations on grasping, handling, fingering and feeling.

R. 855 (emphasis added).

> 3.    *James's Testimony*

During the hearing, James testified that he worked on a "rescue squad" from "January

2022 through April 2022," but that he "had to leave to have [his] right shoulder operated on." R.

48. He explained that "in the course of leaving, they changed the physical requirement for the

rescue squad which imposed [a] strength condition that [he could] no longer meet." *Id.* When

25

asked how much he was "able to lift" at the time he left the job, James testified that his "max" lifting capacity was "right at 50 pounds." *Id.* The ALJ then asked James "what [he could] lift today," on the date of the hearing. *Id.* James testified that he "really [did not] see any change in it now, probably the same." *Id.* However, when the ALJ later asked James to elaborate on his "disabilities and [his] conditions," James testified that since he "had both [his] shoulders replaced," his "strength [was] just not there away from [his] body." R. 49. He explained that "[u]p close," his strength was "not too bad," but "away from [his] body, [he could not] hold much." *Id.* James also testified that "lifting like 50 pounds, it's not like [he] could constantly lift 50 pounds, it's more like occasional." R. 50. Later in the hearing, when asked by his attorney about "how much [he could] lift and hold away from [his] body," James testified "not more than possibly five pounds." R. 52.

When asked about his daily activities, James testified that he had "a dog" that weighed "[m]aybe 60 pounds" and that he did not "pick [the dog] up." R. 50. The ALJ asked James if he "walk[ed] [the dog] outside" or if the dog "go[es] in the yard." *Id.* James testified that the dog "stay[ed] outside." *Id.* When asked if he did "all [his] own shopping," James testified that he did "for the most part." *Id.* When asked if he did "household chores like cleaning, laundry, dishes," James testified that he "d[id] most of that." R. 50–51. When asked about "yard work," James testified that he "mow[ed] [his] yard on a riding mower" and that he "did have a regular like yard tractor mower [but] had such a hard time turning the steering wheel that [he] wanted to do zero turns" and "had to get [a new mower]." R. 51. He also testified that he "pa[id] someone" to do "[w]eed eating and such like that." *Id.* When asked about "home maintenance," James testified that he did "a little bit of stuff, not much, changing filters and things like that." *Id.*

    4.    *The VE's Testimony*

After examining James, ALJ Koclanes asked the VE two hypothetical questions. *See* R. 57–58. First, the ALJ asked the VE to "assume a hypothetical individual of the same age, education, and work experience" as James who "can perform light work as defined in the regulations with no use of ladders, ropes or scaffolds," no crawling, no overhead reaching, and no exposure to unprotected heights, moving machinery, or vibrations, but frequent use of bilateral hand controls and frequent reaching "in other directions with both hands or to the side." R. 57. When asked if "this individual [could] perform [James's] past work," the VE testified that the individual could not. *Id.* When asked if there were "any jobs in the national economy that this individual [could] perform," the VE testified that the individual could perform the jobs of "small parts assembler," "electronics assembler," and "shipping/receiving weigher." R. 57–58.

Next, ALJ Koclanes asked the VE to assume the same hypothetical individual but with a limitation to "lift[ing] a maximum of five pounds." R. 58. When asked if "this individual [could] perform [James's] past work," the VE testified that the individual could not. *Id.* When asked if "this individual [could] perform any other jobs in the national economy," the VE testified that "[t]here would be no work." *Id.*

C.    *ALJ's Evaluation of Dr. Scott's Medical Opinion*

The ALJ evaluated Dr. Scott's medical opinion as part of broader RFC assessment. *See* R. 26–32. He noted that Dr. Scott opined that James "had no limitations with sitting, standing or walking." R. 30–31 (citing R. 855). Dr. Scott "thought [James] could lift and carry 5 pounds only due to bilateral shoulder replacements and pain, but he had no limitations on bending, stooping, crouching, or squatting. R. 31. Dr. Scott also opined that James "could frequently reach, but that he had no limitations on grasping, handling, fingering or feeling." *Id.* ALJ Koclanes provided the following evaluation of Dr. Scott's medical opinion:

This opinion is partially persuasive, in that the examination and medical records do not document any findings that would support limitations in sitting, standing, or walking, or performing some postural and manipulative activities, given his normal grip strength and upper extremity range of motion. In addition, despite his normal range of motion, he did continue to report some difficulty with overhead activities, and a limitation to overhead reaching is supported. *However, the limitation to lifting and carrying 5 pounds is not supported by his exam or consistent with the other records of evidence.* While the claimant did have some decreased deltoid and bicep strength at the consultative examination, his triceps strength, wrist strength, and hand grip were all normal. In addition, it does not appear Dr. Scott took into account the claimant's recent right shoulder surgery, which occurred just three months prior, and the ongoing recovery. In addition, other medical records document normal strength, including his most recent orthopedic exam prior to the right shoulder surgery, which was in December 2021 and showed normal, 5/5 strength bilaterally (Ex. 7F/4–6). The limitation to lifting and carrying only five pounds is also inconsistent with reported activities, including working on his truck, as well as his testimony that he can lift up to 50 pounds occasionally.

R. 31 (emphasis added) (citing R. 564–66).

D.      *Analysis*

ALJ Koclanes did not adequately "explain how [he] considered the supportability and consistency" of Dr. Scott's medical opinion. 20 C.F.R. § 404.1520c(b)(2). While the ALJ "invoked these factors," he "provided invalid reasons for discounting" Dr. Scott's opinion that James could only lift and carry five pounds. *Stephen R.*, 2024 WL 3508155, at *4–5. *Cf. Stoker v. Saul*, 833 F. App'x 383, 386 (4th Cir. 2020) (finding that the "limited reasoning the ALJ did provide does not support his decision" as to the "weighing of the medical opinions"). Each of the ALJ's reasons for rejecting Dr. Scott's opinion is either unsupported by substantial evidence or so lacking in sufficient rationale and citations to relevant evidence as to "make[] it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

First, ALJ Koclanes found that Dr. Scott's opinion lacked supportability because "[w]hile the claimant did have some decreased deltoid and bicep strength at the consultative examination,

28

his triceps strength, wrist strength, and hand grip were all normal." R. 31 (citing R. 853). This finding is "not supported by substantial evidence because [Dr. Scott's report], when read as a whole, reveals no inconsistency between" the normal findings in James's triceps, wrists, and hands and the findings of weakness in James's deltoids and biceps. *Hines*, 453 F.3d at 565. Dr. Scott explained that he found James was limited to lifting and carrying five pounds because his examination showed that James's bilateral "deltoid strength [was] quite weak." R. 855 (citing R. 853). The fact Dr. Scott reached this conclusion knowing that his examination revealed 5/5 strength in James's triceps, wrists, and hands, R. 853, indicates Dr. Scott decided that the normal findings did not undermine his "primary concern" that objective signs of "shoulder weakness" severely restricted James's lifting and carrying capacities. R. 855. The ALJ provides no explanation or citation to medical authority to support his contrary conclusion. Thus, the Court is left to conclude that the ALJ impermissibly "substitute[d] his own lay opinion for a medical expert's when evaluating the significance of clinical findings" related to muscle strength. *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 108 (4th Cir. 2020). Specifically, the ALJ "erroneously exercised an expertise he did not possess in the field of orthopedic medicine."[6] *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984). *Cf. Desmarais v. O'Malley*, No. 7:23cv7, 2024 WL 1328200, at *8 (E.D.N.C. Feb. 6, 2024) ("The ALJ is not a medical expert, and his characterization of Desmarais's physical examinations as normal—despite the presence of abnormalities specifically related to her chronic back pain—mischaracterizes the record and

---

[6] Tellingly, a survey of other Social Security cases suggests that medical sources often recommend limitations on lifting and carrying based on deltoid weakness *even when there have been no findings of weakness in the triceps, wrists, or hands*. *See, e.g.*, *Dillin v. Comm'r of Soc. Sec.*, No. 9cv512, 2010 WL 2666948, at *6 (N.D.N.Y. May 17, 2010) ("Dr. Naughton noted 'shoulder pain in the deltoid region, AC joint area' . . . Moderate limitations were assessed as to lifting and carrying."); *Davis v. Shalala*, 859 F. Supp. 1011, 1016 (N.D. Tex. 1994) ("With regard to lifting and carrying, Dr. Hutton said [the claimant] had weak deltoids . . . With regard to how much he could *lift* and *carry* the Doctor said he cannot do anything in this category.").

frustrates meaningful review.").

Second, ALJ Koclanes found Dr. Scott's opinion lacked supportability because "it [did] not appear Dr. Scott took into account the claimant's recent right shoulder surgery, which occurred just three months prior, and the ongoing recovery." R. 31. Here, the ALJ's reliance on a conclusory observation with no explanation of what made it "appear" that Dr. Scott did not consider James's recent surgery is itself error. *See Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 358 (4th Cir. 2023) ("[W]here an ALJ fails to specify which specific objective evidence supports his conclusion, that 'analysis is incomplete and precludes meaningful review.'"); *Linger v. Comm'r of Soc. Sec. Admin.*, No. 22-2192, 2025 WL 40548, at *6 (4th Cir. Jan. 7, 2025) (finding the record "did not contain sufficient evidence to support the agency's factual determinations" where the ALJ rejected a medical opinion based on his "conclusory observation" that the physician "appear[ed] to have relied heavily upon [the claimant's] subjective complaints and statements"). Moreover, Dr. Scott's own report contradicts the ALJ's suggestion that he did not consider James's most recent shoulder surgery. He wrote that James could "be expected to lift and carry 5 pounds only *due to bilateral shoulder replacements*, shoulder pain." R. 855 (emphasis added); *see also* R. 850 (noting that James "had bilateral shoulder replacements"); R. 851 (providing dated list of surgeries to both shoulders). Because Dr. Scott expressly stated in his report that he based his opinion on the very information the ALJ believed he overlooked, the ALJ's finding is not supported by substantial evidence. *See Hines*, 453 F.3d at 566 ("The deference accorded to an ALJ's findings does not mean that we credit even those findings contradicted by undisputed evidence.").

Third, ALJ Koclanes found that Dr. Scott's opinion lacked consistency because "other medical records document normal strength, including his most recent orthopedic exam prior to

30

the right shoulder surgery, which was in December 2021 and showed normal, 5/5 strength

bilaterally." R. 31 (citing R. 565). As an initial matter, the ALJ's citation to a single finding[7] of

full bilateral shoulder strength by Dr. Werner provides little support for the ALJ's conclusion

considering that the roughly four-year longitudinal record in this case includes many other

findings related to shoulder strength by Dr. Werner himself and by other medical sources. *See* 82

FR 5844-01, 2017 WL 168819, at *5854 ("[O]ur use of the word 'consistent' in the regulations

is the same as the plain language and common definition of 'consistent.' This includes

consideration of factors such as whether the evidence conflicts with other evidence from other

medical sources and whether it contains an internal conflict with evidence from the same medical

source."); *Drumgold*, 144 F.4th at 607 (explaining that the consistency factor "makes sense"

because if "a host of sources say one thing, but a single source says something different, then one

should question the reliability of the contradictory source"). Further, the ALJ improperly

cherrypicked a single purportedly inconsistent finding to discredit Dr. Scott's opinion—and, in

turn, support a finding of nondisability—while ignoring significant evidence in the record that is

consistent with Dr. Scott's opinion. *See Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to

consider all relevant medical evidence and cannot simply cherrypick facts that support a finding

of nondisability while ignoring evidence that points to a disability finding."); *Angelena S. v.*

*Kijakazi*, No. CV 1:22-1022, 2022 WL 17947402, at *15 (D.S.C. Dec. 28, 2022) ("The ALJ is

---

[7] Although the ALJ alludes to "other medical records document[ing] normal strength" besides the cited December 2021 finding, R. 31 (citing R. 565), the Court cannot meaningfully review whether uncited, unidentified medical records support the ALJ's finding, *see Monroe*, 826 F.3d at 191 (explaining that the ALJ's conclusory statement that "the objective evidence or the claimant's treatment history did not support the consultative examiner's findings," without specific citations to the record, precluded meaningful review). Even "read[ing] the ALJ's decision as a whole," *Keene*, 732 F. App'x at 177, the Court finds no reference to other medical records showing 5/5 shoulder strength bilaterally, *see* R. 27–29 (ALJ's summary of medical records), and, in reviewing the record, the Court was unable to locate any other medical notes containing that finding. On the contrary, exam records consistently show decreased strength in one or both shoulders. *See, e.g.*, R. 418, 421, 446, 456–57, 460–61, 641, 791–82, 807–08.

not allowed to cherry-pick the record, referencing only the evidence that supports his conclusion as to the persuasiveness of the medical opinion and ignoring evidence to the contrary."); *Lee v. O'Malley,* No. 4:23cv213, 2024 WL 4787941, at *7–9 (E.D.N.C. Nov. 14, 2024) (remanding where the ALJ "cherrypicked evidence to discredit the medical opinions" of multiple medical sources).

During the same December 2021 visit with Dr. Werner cited by the ALJ, James reported "gradually worsening [right] shoulder pain" that felt "crunchy." R. 564. Imaging of his right shoulder revealed "[s]evere degenerative changes of the glenohumeral joint including joint space loss, subchondral sclerosis, and inferiorly oriented osteophytes," and "[m]ild degenerative arthrosis of the acromioclavicular joint." R. 570. Despite finding 5/5 strength bilaterally, Dr. Werner determined during the visit that James was a candidate for a right reverse total shoulder replacement because he had "failed extensive conservative treatments." R. 565.

On April 1, 2022, pre-operative imaging confirmed "[s]evere degenerative changes of the right glenohumeral joint" and "[m]ild to moderate degenerative changes of the [acromioclavicular] joint." R. 828–29. On April 25, 2022, when James underwent the right reverse total shoulder replacement, Dr. Werner noted that James had been experiencing "recalcitrant pain and dysfunction secondary to end stage osteoarthritis," including "activity derived symptoms with deterioration in function." R. 838. Similarly, James's physical therapist Mr. Kalbach observed that James's right shoulder had "been getting progressively worse" leading up to the right reverse total shoulder replacement, forcing him to "discontinue strength training." R. 609. After the procedure, James initially reported that he could not use his right arm to dress himself, cut food with a fork and knife, drive a car, or even reach across a table to retrieve a saltshaker. R. 610, 716. On May 6, 2022, James was still taking oxycodone and other

32

medications for pain, and imaging again showed "[m]oderate degenerative change of the acromioclavicular joint." R. 841–43. While James made progress during physical therapy sessions with Mr. Kalbach in May and June 2022, *see* R. 593, 595, 599, 603, 605, 607, he also complained of pain and functional limitations, *see, e.g.*, R. 593 (June 2, 2022: "I am aching all over. I have been cleaning and landscaping. My right trap is tense because I am hiking my shoulder all the time."), and was unable to complete certain exercises, *see, e.g.*, R. 593 (June 2, 2022: "R shoulder Flx and scaption AAROM with pulleys: 3-second holds, NOT TODAY"). On June 17, 2022, almost two months after the procedure, James received a work note "for left-handed work only." R. 848.

Considering the entire record, "it seems reasonable to believe that perhaps [James's] objective ailments worsened" between Dr. Werner's December 2021 examination and Dr. Scott's July 2022 examination. *Oakes*, 70 F.4th at 215. The Court, of course, may not "infer a medical diagnosis—like symptom progression." *Id.* However, the ALJ did not explain why a single normal finding of 5/5 bilateral shoulder strength shows that Dr. Scott's July 2022 opinion that James could carry no more than five pounds is inconsistent with the many other findings of limitations noted by Dr. Werner and Mr. Kalbach from both before and after James's shoulder surgery, as well as Dr. Scott's own findings of limited strength. This lack of explanation creates an "absence of clarity on the issue[] of consistency" such that "it cannot be said that substantial evidence supports" the ALJ's finding. *Id. Cf. Easterbrook v. Kijakazi*, 88 F.4th 502, 514 (4th Cir. 2023) (holding that the ALJ erred by rejecting a medical source's opinion that the claimant could "lift only five pounds" based on "an improperly limited view of the record" that ignored evidence of "persistent, worsening pain" and "increasing weakness"); *Testamark*, 736 F. App'x at 399 ("By relying on these limited observations . . ., the ALJ's opinion seizes on insignificant

33

inconsistencies in the treatment record while overlooking the record's broader import.").

Fourth, ALJ Koclanes found that Dr. Scott's opinion was "inconsistent with [James's] reported activities, including working on his truck." R. 31. The Court will "read the ALJ's decision as a whole," *Keene*, 732 F. App'x at 177, and assume that the ALJ's reference to James's "reported activities," R. 31, also includes the activities described earlier in the written decision:

> [James] testified that he is able to mow the lawn using a riding lawnmower, perform household chores and home maintenance, and walk his dog. In addition, the records indicate that he started swimming and kayaking in June 2020 (Ex. 3F/37); he was doing a lot of hammering in October 2020 (Ex. 3F/57; 9F/102); he reported doing a lot of work on his truck in March 2021, including removing rust from the frame, painting the frame, and installing nerf bars without needing to lift overhead (Ex. 9F/63); he was doing a lot of woodworking in March 2021 (Ex. 9F/61); he continued to work on his truck in April 2021, removing the rear bumper and using an impact driver to remove bolts (Ex. 9F/63); he was doing strength training at home in May 2021 (Ex. 9F/44); he waxed his vehicle in May 2021 (Ex. 9F/42); he was playing softball in July 2021 (Ex. 9F/34, 141–143); he reported using a pressure washer in May 2022 (Ex. 9F/8); and he reported cleaning and landscaping in June 2022 (Ex. 9F/6).

R. 29 (citing R. 445, 465, 593, 595, 621, 629, 631, 648, 650, 689, 728–30). Here, the ALJ "improperly considered [James's] daily activities . . . when explaining why [he] found [Dr. Scott's] opinion regarding [James's] limited [lifting and carrying capacities] to be unpersuasive." *Oakes*, 70 F.4th at 216. Most of the cited activities occurred before James's right shoulder surgery in April 2022, and the ALJ failed to explain how these activities could bear on the persuasiveness of Dr. Scott's opinion that James could "lift and carry 5 pounds only *due to bilateral shoulder replacements*, shoulder pain." R. 855 (emphasis added); *see Oakes*, 70 F.4th at 214–15 (emphasizing the ALJ's duty to consider the possibility of "symptom progression" and "the role the passage of time could play in reconciling" evidence with a medical opinion).

Additionally, the ALJ pointed to no evidence indicating that any of the cited activities

34

involved lifting or carrying more than five pounds, so the Court is "'left to guess' as to how the ALJ reached [his conclusion that James's reported activities were inconsistent with Dr. Scott's opinion] in light of the evidence of record." *Testamark*, 736 F. App'x at 398 (quoting *Mascio*, 780 F.3d at 638). *Cf. Stoker*, 833 F. App'x at 387 (remanding where "the ALJ failed to cite any evidence that contradicted Dr. McMenemy's opinion regarding Stoker's residual functional capacity and thus failed to adequately explain his decision to discredit the opinion"). For example, during the October 2023 hearing, James testified that he did not "pick up his dog" that weighed "60 pounds" and that the dog instead "stay[ed] outside." R. 50. He also testified that he had a "hard time turning the steering wheel" on a regular rider mower, and that he "pai[d] someone" to do "[w]eed eating and such like that." R. 51. As to home maintenance, James testified that he only did "a little bit of stuff, not much, changing filters and things like that," R. 51, mentioning no tasks that involve lifting objects weighing more than five pounds. Additionally, the record reveals that James reported many of the cited activities in the context of complaints about functional limitations and pain. *See e.g.*, R. 646 ("neck hurt" after he "work[ed] on [his] truck" and "us[ed] an impact driver to remove the bolts" from the rear bumper); R. 629 ("sore in [his] left shoulder and neck" after he "waxed [his] car"); R. 595 ("sore" after he "used [his] pressure washer"); R. 593 ( "aching all over" and "right trap [was] tense" after doing "cleaning and landscaping"). "An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which [he] can perform them." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), *superseded by rule on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872, 878–79 (4th Cir. 2023). In sum, the ALJ did not adequately explain how James's activities were inconsistent with Dr. Scott's opinion considering that most of the activities predated James's right shoulder replacement, nothing indicated that the activities

35

involved lifting or carrying over five pounds, and James experienced difficulty and pain during many of the activities. "Put simply, the ALJ's lack of explanation requires remand." *Patterson*, 846 F.3d at 663 (cleaned up).

Finally, ALJ Koclanes found that Dr. Scott's opinion was inconsistent with James's "testimony that he [could] lift up to 50 pounds occasionally." R. 31. However, because the ALJ "selectively cited [testimony] concerning [James's lifting capacity] and improperly disregarded [his] qualifying statements," the ALJ "failed to build an accurate and logical bridge from the evidence to his conclusion." *Arakas*, 983 F.3d at 100. At the hearing, after James testified that the "max" he thought he "could lift of his functional capacity was right at 50 pounds" in April 2022, the ALJ asked James: "And what would that be today? What could you lift today?" R. 48. James responded that he "really [did not] see any change in it now, probably about the same." R. 48. But James later elaborated that since he "had both [his] shoulders replaced" his "strength [was] just not there away from [his] body." R. 49. He testified: "Up close, I'm not too bad but things away from my body, I can't hold much weight as far as that." R. 49. The ALJ said that he "underst[ood]" James to have testified that he "could lift 50 pounds but not if it's a distance away from [him] so maybe if it's held close." R. 49. When later asked by his counsel about how much he could "lift and hold away from his body," James testified that he "would say not more than possibly five pounds." R. 52. Thus, the ALJ improperly cited James's testimony about lifting fifty pounds close to the body to support his conclusion while ignoring Jame's qualifying statements and testimony that he could lift no more than five pounds away from his body, which were *consistent with* Dr. Scott's opinion. *See Jamie B. v. Bisignano*, No. CV 24-1948, 2025 WL 2021721, at *5 (D. Md. July 18, 2025) ("These qualifying statements reflect [the claimant's] position that . . . activities she performs are curtailed due to her impairments. While the ALJ

36

need not have accepted these statements at face value, the ALJ was nonetheless required to evaluate them."). *Cf. Hines*, 453 F.3d at 565 (reversing where the ALJ "disregarded" the claimant's "qualification of his activity levels" because an ALJ "may not select and discuss only that evidence that favors his ultimate conclusion").

Dr. Scott's opinion limiting James to lifting and carrying no more than five pounds, if credited, would direct a finding of disability. *See* R. 32–33 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 202.14, 202.21); R. 58 (VE testimony that "[t]here would be no work" when the ALJ changed the hypothetical to add a limitation to "lift[ing] a maximum of five pounds"). Under these circumstances, the Court cannot conclude that the ALJ's failure to adequately explain how he evaluated Dr. Scott's opinion was harmless.

### V. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **REVERSE** the Commissioner's final decision and **REMAND** James's case under the fourth sentence of 42 U.S.C. § 405(g).

### <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

ENTER: February 25, 2026

Joel C. Hoppe
United States Magistrate Judge